CENTRAL ILLINOIS PUBLIC SERVICE COMPANY, Plaintiff-Appellant, v. ALLIANZ UNDERWRITERS INSURANCE COMPANY *et al.*, Defendants (St. Paul Fire and Marine Insurance Company, Defendant-Appellee).

First District (6th Division)   No. 1—91—1735

Opinion filed January 22, 1993.—Modified on denial of rehearing April 30, 1993.

RAKOWSKI, J., dissenting.

Kevin M. Forde, Ltd., of Chicago, Sorling, Northrup, Hanna, Cullen & Cochran, of Springfield, and Anderson, Kill, Olick & Oshinsky, of New York, New York (Lester O. Brown, Stephen R. Kaufmann, and Kevin M. Forde, of counsel), for appellant.

Adams, Duque & Hazeltine, of San Diego, California (Mitchell L. Latrop, David R. Gold, and Sharon Engel, of counsel), and Kitch, Saurbier, Drutchas, Wagner & Kenney, of Detroit, Michigan (Stephen Kelley and Mary Lou Korejwo, of counsel), for appellee.

JUSTICE EGAN delivered the opinion of the court:

The plaintiff, Central Illinois Public Service Company (CIPS), appeals from an order granting summary judgment to the defendant, St. Paul Fire & Marine Insurance Company (St. Paul).

In December 1969, St. Paul issued a comprehensive general liability policy to Middle West Service Company (Middle West). Middle West was the administrator of the Risk Management Trust, an organization formed by a group of utilities, which included the plaintiff, to secure insurance coverage for certain risks. The policy at issue was purchased by Middle West and provided coverage through December 31, 1972. The premium for the policy was $30,000 per year. According to St. Paul's motion for summary judgment, at the time it issued the policy, St. Paul did not know that Middle West was acting as an intermediary and that the insurance coverage St. Paul was issuing was actually for 21 independent utility companies. The plaintiff denies this.

The policy was an "occurrence" policy, as distinct from a "claims made" policy. Under an "occurrence" policy, a claim for liability resulting from damage or injury which happened during the policy period may be made after the policy is terminated.

St. Paul sought to limit the number of insureds under the policy, but Middle West would not agree to such a limitation. St. Paul never sought rescission or reformation of the policy. In June 1972, six months before the policy was to terminate, the parties agreed to end

coverage. On June 23, 1972, a document entitled "Lost Policy Receipt" was executed and contained the following provision:

"In consideration of the return premium shown above, I (we) hereby surrender, release and relinquish all of my (our) rights, title and interest [in the policy] and all advantages to be derived therefrom, and said insurance policy having been lost or mislaid, I (we) agree to make no claim whatever for any loss or damage on which the company would be liable under the policy, and to return the policy, if same should be found, to the company forthwith, and without further compensation, and I (we) certify that said insurance policy has not been assigned or transferred in any manner whatsoever."

St. Paul returned to Middle West $15,000 representing a return premium for the six-month period remaining in 1972.

In August 1987, CIPS brought a declaratory judgment action seeking a declaration of the parties' rights and obligations with respect to environmental damage sustained at a gas manufacturing site in Taylorville, Illinois, during the period the policy was in effect before the execution of the Lost Policy Receipt. St. Paul moved for summary judgment, arguing that it had no duty to defend or indemnify the plaintiff under the policy because of the language of the Lost Policy Receipt. The trial judge granted summary judgment to St. Paul. He held that the terms of the Lost Policy Receipt were unambiguous, and he refused to receive any extrinsic evidence. The judge, however, reviewed the extrinsic evidence offered by the plaintiff and found that the evidence was "useless."

The plaintiff contends that summary judgment was improperly granted because the Lost Policy Receipt was ambiguous on its face; that if it was not ambiguous on its face, extrinsic evidence should have been permitted; and that if St. Paul's interpretation of the policy is correct, the Lost Policy Receipt was not supported by consideration. St. Paul maintains that the question of whether the receipt was supported by consideration was not argued in the trial court and is, therefore, waived in this court.

After oral argument in this court, we requested further briefing on the issue of consideration. In the memorandum submitted by St. Paul at our request, it again maintains that the plaintiff had waived any argument that the Lost Policy Receipt lacked consideration; alternatively, St. Paul argues that the Lost Policy Receipt was supported by consideration. We have determined that the plaintiff did not waive the argument that the lost policy agreement lacked consideration, although we concede that the argument was not advanced with the

same specificity that it could have been in the trial court and was advanced in this court.

In its motion for summary judgment St. Paul said that the Lost Policy Receipt was "supported by bargained-for consideration."

In response to the motion for summary judgment, the plaintiff said this:

> "In return for the release, CIPS received a refund of $15,000 which represented the premium amount for the remaining six months. St. Paul retained $75,000 in premium payments. It is nonsensical to interpret the Receipt as forfeiting CIPS' rights to pursue claims for liability resulting from damage or injury which happened during the period of time the policy was in effect and for which CIPS paid for coverage. If the release is interpreted as urged by St. Paul, CIPS paid $75,000 for nothing. *** Although St. Paul opines that CIPS 'enjoyed the benefits of coverage' until July of 1972, it fails to explain what those benefits could possibly be in light of its argument that, as of July 1, 1972, CIPS intended that the $75,000 it had paid for coverage actually purchased nothing."

To that argument of CIPS, St. Paul replied:

> "CIPS states, that there would be no surrender of a policy if the carrier retained a portion of the premium paid, because in so doing the insured would have paid for nothing. However, the logical corollary to this argument is that if a person buys a homeowner's policy against the risk that his house will burn down and his house does not burn down, that he had paid for nothing. The argument reveals a disturbing failure to grasp the nature of insurance. *St. Paul's contention is, and has been, that if CIPS had tendered a covered claim prior to the cancellation of the policy, that claim would have been paid.* CIPS had coverage for the two and one-half years that the policy was in effect and premiums were retained for that period of time." (Emphasis added.)

The judge did consider the plaintiff's argument as evidenced by these remarks:

> "CIPS poses an honest question: Why would it pay $75,000 for no coverage? One can only speculate. The policy had been lost. The kinds of pollution occurrences involved in this case were relatively unknown at the time. It is not my role to answer that kind of question when the language of the Receipt is clear."

Parenthetically, we observe that it was St. Paul that revealed a failure to grasp the distinction between an "occurrence policy" and a "claims made" policy.

St. Paul has cited *Kellan v. Board of Trustees of the Firemen's Pension Fund* (1990), 194 Ill. App. 3d 573, 551 N.E.2d 264, in support of its argument that the plaintiff has waived any argument concerning lack of consideration. The *Kellan* case is authority against St. Paul. In *Kellan*, the court noted that the general rule that matters not raised in the trial court may not be raised for the first time in a court of review is a limitation on the parties and not on the court, which has the responsibility for a just result. The court also noted that at the administrative hearing, the plaintiff, a firefighter seeking disability benefits, had in fact raised the argument allegedly waived, although not in the precise fashion he did in the circuit court on administrative review and in the appellate court. The plaintiff argued in the circuit court that the injury he received aggravated a preexisting injury. The defendant pension fund argued that he had waived that argument by failing to make it at the administrative level. The argument was made at the administrative level that the injuries to the plaintiff's back suffered while on duty were contributing factors to his back problems. The appellate court held that there was no reasonable distinction between an argument that an act contributed to one's condition and an argument that the act aggravated a preexisting condition.

■ We repeat that the plaintiff could have posited the issue much more clearly to the trial judge; and we agree with St. Paul that the absence of waiver is clearer in *Kellan* than it is in this case. But we judge that the burden of establishing waiver of a legal argument should be on the party asserting it. While it may be doubtful to some persons whether the plaintiff here raised the question of lack of consideration, we believe that any doubt should be resolved against St. Paul. Moreover, the facts of this case call for invocation of the exception to the waiver rule recognized in *Kellan* that the waiver rule is a limitation on the parties and not on the court, which has the responsibility for a just result. (See also *Hux v. Raben* (1967), 38 Ill. 2d 223, 230 N.E.2d 831.) For these reasons, we hold that the plaintiff has not waived the right to argue in this court that the lost policy agreement lacked consideration.

Both parties agree that to be enforceable the Lost Policy Receipt, like any contract, must be supported by consideration. The receipt, which is characterized by St. Paul as a "release," provides that the

consideration is the return of the $15,000 unearned premium. In its brief, St. Paul said this:

"CIPS agreed, in lieu of limiting the number of insureds under the policy, to cancel the policy and to make no claims, in consideration for which St. Paul would return the remaining premium. St. Paul could not unilaterally cancel the policy, CIPS bargained for and got consideration for the early termination."

Although the right to cancellation is not dispositive of the issue of consideration, it is appropriate to address that right. The policy itself provides that the policy "may be cancelled by either party upon written notice"; the notice was to be not less than a specific number of days. If cancelled by the insured, "adjustment of premium shall be at short rate and if cancelled by the [insurer], adjustment shall be pro rata." St. Paul denies it had an absolute right to cancel, despite the language of the policy, and cites section 143.16a of the Insurance Code (Ill. Rev. Stat. 1989, ch. 73, par. 755.16a). That section provides that policies of insurance, with some exceptions, may be terminated for only certain express reasons. Section 143.16a was not in effect when the policy of insurance was issued in 1972. At that time the reasons justifying cancellation expressed in section 143.16a applied only to "fire and extended coverage insurance" (Ill. Rev. Stat. 1971, ch. 73, par. 755.1a) and to automobile liability insurance (Ill. Rev. Stat. 1971, ch. 73, par. 755.3). Therefore, we have strong doubts that St. Paul's right to cancellation in 1972 was subject to the same restrictions now contained in section 143.16a. In any event, our discussion on this point is academic because St. Paul maintains that it sought to cancel because of an increased risk, which is one of the reasons justifying cancellation under section 143.16a. In addition, St. Paul also alleges that Middle West made misrepresentations to St. Paul upon which St. Paul relied. A misrepresentation is another ground for cancellation under section 143.16a. We will discuss misrepresentation later.

Finally, lest our extensive discussion on this point be misunderstood, we wish to make it clear that whether St. Paul had an absolute right to cancel the policy is irrelevant.

In *Knights Templars & Masons Life Indemnity Co. v. Crayton* (1904), 209 Ill. 550, 70 N.E. 1066, an insurance company denied that it was liable on a $5,000 life insurance policy because the deceased had committed suicide. The insurer agreed that it was liable for $179, which was the amount of assessments paid on the policy. The payment of $179 was made by a check which contained the following language: "Being payment in full *of all demands* under policy No. 2174, on the

life of John Crayton, deceased." (Emphasis added.) (209 Ill. at 553.) Upon receipt of the check, the representative of the estate surrendered the policy and endorsed a receipt which purported to be "in full of all claims under the within policy." The insurer argued that by accepting the $179 "in full of all demands" under the policy, the agent of the insured had released the insurer for payment of the $5,000 death benefit. To that argument the supreme court said this:

> "By its supposed settlement with the guardian it paid her one of the sums that it owed to her. There was no question about that amount being due, and the payment of it could not, in any sense, be said to be a settlement of anything. It was simply payment of a sum of money due. *** By the payment of a portion of a whole debt, or by the payment of one of two entire debts, the appellant could not, by any stipulation made with the guardian, be released from its liability to pay the entire debt thus owing, and the release relied upon was ineffectual because there was no consideration for it. [Citations.]" (*Knights Templars*, 209 Ill. at 558.)

*Knights Templars* was cited in *Smyth v. Kaspar American State Bank* (1956), 9 Ill. 2d 27, 136 N.E.2d 796, for the holding that "[t]he payment of a sum admittedly due furnishes no consideration for the discharge of an additional disputed liability, even where such sum is accepted as full payment." 9 Ill. 2d at 43.

*Knights Templars* was also cited in *DeSoto Life Insurance v. Jeffett* (1946), 210 Ark. 371, 196 S.W.2d 243, in which the insured made a claim for total disability. The insurer began payments of $200 a month. The insurer was three months behind in payments and eventually sent the insured a check for one month. The insured went to the office of the insurer and signed the following instrument: "In consideration of the sum of $400 paid to me this 24th day of May, 1945, I do hereby release the DeSoto Life Insurance Company from the total disability clause in [the policy] and agree to go on partial disability according to the terms of [the policy] ***." (*DeSoto*, 210 Ark. at 373, 196 S.W.2d at 244.) Citing several cases from other jurisdictions, the supreme court of Arkansas noted the general rule that "the payment of a liquidated, undisputed, matured obligation does not furnish a consideration for the release of any additional obligation." *DeSoto*, 210 Ark. at 377, 196 S.W.2d at 246.

■ We see no material distinction between this case and *Knights Templars*. Cancellation did not require consideration, and no release was required. Return of unearned premiums, however, is a condition precedent to cancellation of a policy. (*Annes v. Carolan, Graham,*

*Hoffman, Inc.* (1929), 336 Ill. 542, 168 N.E. 637.) When St. Paul returned the unearned premium, it gave the plaintiff nothing more than the plaintiff was entitled to receive as a matter of law. In our judgment, St. Paul's tender of the unearned premium of $15,000 (the sole consideration recited in the receipt) does not constitute consideration for the release of the plaintiff's claims under the policy.

In the memorandum submitted at our request after oral argument, St. Paul identifies the consideration supporting the receipt as follows:

> "In the instant case the entire reason for cancelling the policy was because the premium charge did not reflect the risk that was being insured. St. Paul intended to insure one utility company and its subsidiaries, instead it found itself insuring 21 separate utility companies. St. Paul returned the unearned premium and *waived its opportunity to prove misrepresentation, mistake or fraud.* This waiver constitutes consideration for the release." (Emphasis added.)

This argument is not only of very questionable legal validity, but it is factually at odds with the record. St. Paul filed an answer and 34 affirmative defenses. The 34th affirmative defense is based on the Lost Policy Receipt. The 9th affirmative defense is as follows:

> "Coverage is barred in whole or in part to the extent that CIPS, negligently or intentionally, failed to disclose, concealed or misrepresented facts which were material and were known by CIPS to be material to the risk allegedly undertaken by St. Paul for the purpose of inducing St. Paul to issue or renew its policy to CIPS."

The 28th affirmative defense is as follows:

> "St. Paul is not liable in any manner set forth in the second amended complaint since CIPS is barred from any recovery by reason of the equitable doctrine of unclean hands."

The cases cited by St. Paul are not apposite. In two of the cases the insurers introduced evidence that they had undertaken an increased risk justifying the retention of premiums. In another, *Nelson v. Fire Insurance Exchange* (1987), 156 Ill. App. 3d 1017, 510 N.E.2d 137, the plaintiffs cashed a check from their insurance company which contained printed language to the effect that endorsement of the check constituted a release of all claims against the company. The plaintiffs crossed out that language from the check and cashed it. The court found that by cashing the check, which was for a sum which was disputed by the insurance company and less than the plaintiffs claimed they were due, the plaintiffs effected an accord and satisfac-

tion. The court said: "If there is *an honest dispute* between the parties, a tender by the debtor with the explicit understanding of both parties that it is in full payment of all demands, and in acceptance by the creditor, there is an accord and satisfaction." (Emphasis added.) (*Nelson*, 156 Ill. App. 3d at 1020.) In the case before us, the record does not establish as a matter of law that there was an honest dispute between the parties.

Although the request we made to the parties after oral argument asked that they address only the question of consideration, St. Paul's memorandum also argued that the plaintiff's claim was barred by the statute of limitations and *laches*. We note that the statute of limitations, which was never argued by St. Paul in the trial court, *or in this court*, is the fourth affirmative defense filed by St. Paul. *Laches* had not even been pleaded.

■ We accept St. Paul's argument and the trial judge's finding that the Lost Policy Receipt was not ambiguous and that extrinsic evidence was not admissible, but we cannot accept St. Paul's claim, based on the record before us, that St. Paul has established as a matter of law that the plaintiff's claim is barred by the statute of limitations or *laches*. We are passing only on the issue that has been presented to us: Was the plaintiff entitled to summary judgment? We hold, based on the record before us, that St. Paul has not established as a matter of law that the Lost Policy Receipt was supported by consideration.

Before closing this opinion we will address St. Paul's petition for rehearing. First, St. Paul tells us that our invocation of the exception to the rule that matters not raised in the trial court are waived on review is an unprecedented departure from the rule and is an abridgment of the legislature's determination that lack of consideration is an affirmative defense which the plaintiff was required to, and did not, plead. Second, St. Paul tells us that we have deprived St. Paul of the right to prove lack of consideration.

■ In response to St. Paul's first argument, we point out that an insurance policy is often more than a contract between two parties; very often the public interest is involved. We note that the cases our research has disclosed which recognize the public interest of insurance policies are automobile liability policies (see, *e.g., Allstate Insurance Co. v. Keller* (1958), 17 Ill. App. 2d 44, 149 N.E.2d 482), but we believe that policies covering pollution of the environment necessarily also involve the public interest. They are, to use the language of the case cited by St. Paul, matters of "great public importance." (*Cf. People ex rel. Baylor v. Bell Mutual Casualty Co.* (1973), 54 Ill. 2d 433,

439, 298 N.E.2d 167, 171 (the fact that the trial court did not specifically rule on the interpretation of the Insurance Code by the Director of Insurance did not preclude review by the supreme court; supreme court found the issue to be "of great public importance").) The nature of the policies in this case, therefore, provides a strong reason for avoidance of the strict provisions of the general waiver rule.

To St. Paul's second argument, we repeat our emphasis that we were passing only on the question of whether summary judgment was properly granted. If St. Paul can establish to the trial court's satisfaction, under any legal theory or any set of facts, that the Lost Policy Receipt was supported by consideration, by all means it should be given the opportunity to do so. We said only that St. Paul had not established consideration as a matter of law to our satisfaction based on the arguments St. Paul advanced. We also pointed out that St. Paul's claim that consideration existed because it had "waived its opportunity to prove misrepresentation, mistake or fraud" was contrary to the record. The ninth affirmative defense, to which we have previously referred, alleges fraud on the part of the plaintiff, and if proved, would entitle St. Paul to rescission. That defense will still be pending in the circuit court after this case is remanded.

In this regard we disagree with St. Paul's argument in the petition for rehearing that a claim for rescission is not contained in its affirmative defenses. When one party commits fraud in the execution of a contract, the other party has an election of remedies. He may seek rescission or damages in either contract or tort. (See *Sciarabba v. Chrysler Corp.* (1988), 173 Ill. App. 3d 57, 527 N.E.2d 361.) The ninth affirmative defense is not a claim for damages.

In the petition for rehearing, St. Paul argues that when it agreed to issue the policy to Middle West, St. Paul had not realized it was insuring an additional 21 companies. The plaintiff argues that St. Paul's argument is not tenable because it calls upon this court "to look to extrinsic evidence on the issue of intent" and that St. Paul has failed to establish that its intent resulted in an agreement between the parties to execute the Lost Policy Receipt. The plaintiff then argues the merits of St. Paul's contention that it did not know it was insuring 21 independent utilities.

The issue of St. Paul's intent involves a question of fact and is not properly before us. Like the issue of consideration and the other affirmative defenses raised by St. Paul, the question of St. Paul's intent, if pertinent, may be resolved by the trier of fact. Under certain circumstances a contract may be rescinded where there is a material mistake of fact going to the essence of the contract. (17 C.J.S. *Con-*

*tracts* §111 (1991).) Fairness requires that St. Paul should be permitted to plead and prove its right to rescission based on a material mistake of fact.

For these reasons the order granting summary judgment to St. Paul is reversed and the cause is remanded for further proceedings consistent with this opinion.

Judgment reversed and remanded.

McNAMARA, P.J., concurs.

JUSTICE RAKOWSKI, dissenting:

At the trial level, the only issue argued by the parties and considered by the trial judge was whether the release was ambiguous. Lack of consideration was never an issue. Yet, on appeal, the case is decided based upon lack of consideration (an issue never raised by CIPS) and the opinion fails to even mention the issue of ambiguity. For the following reasons, I believe that the refusal to apply the waiver doctrine to this case is not in accord with Illinois law and resulted in manifest prejudice to St. Paul. Parenthetically, I construe the majority's silence on the ambiguity issue to mean that they agree with the trial judge that the release is unambiguous. With this, I am in complete accord.

The record in this case exceeds 2,500 pages and CIPS' 165-count declaratory complaint alone exceeds 600 pages. Nowhere does CIPS ever mention lack of consideration. The only time consideration was ever mentioned below was in St. Paul's motion for summary judgment, wherein it is alleged that the Lost Policy Receipt was supported by bargained-for consideration. This allegation was not disputed by CIPS. The majority, in reasoning that CIPS raised lack of consideration below, refer to one paragraph (out of a 2,500-page record) wherein CIPS argues that "[i]f the release is interpreted as urged by St. Paul, CIPS paid $75,000 for nothing."

This argument, however, was made in an ambiguity issue context. CIPS was attempting to show that St. Paul's construction was not a reasonable one and that as a result the release was ambiguous. This point is reinforced by the trial judge's statement:

> "CIPS poses an honest question: Why would it pay $75,000 for no coverage? One can only speculate. The policy had been lost. The kinds of pollution occurrences involved in this case were relatively unknown at the time. *It is not my role to answer*

*that kind of question when the language of the Receipt is clear."* (Emphasis added.)

Both parties are experienced business entities, represented by more than adequate legal counsel, and lack of consideration is not exactly a remote legal concept. I find it inconceivable for CIPS to maintain that it raised the issue below, yet agree that it never once mentioned lack of consideration in the lengthy record. The issue was simply not raised below. As such, one can only conclude that the issue was not raised by design.

It is well settled that issues not raised in the trial court are generally waived on appeal. (*Western Casualty & Casualty Surety Co. v. Brochu* (1985), 105 Ill. 2d 486, 500, 475 N.E.2d 872.) The reasoning underlying this general precept is that the appellate court should not consider different theories or new questions on appeal, if proof might have been offered to refute or overcome them had they been presented below. *Carter v. Dunlap* (1986), 138 Ill. App. 3d 58, 60, 484 N.E.2d 1273, citing *Skokie Gold Standard Liquors, Inc. v. Joseph E. Seagram & Sons, Inc.* (1983), 116 Ill. App. 3d 1043, 1052, 452 N.E.2d 804. See also *Klubeck v. Division Medical X-Ray, Inc.* (1982), 108 Ill. App. 3d 630, 635, 439 N.E.2d 506; *McKanna v. Duo-Fast Corp.* (1987), 161 Ill. App. 3d 518, 528, 515 N.E.2d 157.

While there is support for the majority position that the waiver rule is a limitation on the parties and not on the court, this exception has only been applied to issues of law. Such is not the case *sub judice*, where St. Paul has referred repeatedly in its brief to facts (apparently not in the record, but not disputed by CIPS) that there was a material misrepresentation on the part of CIPS' procuring agent to the effect that St. Paul insured multiple utility companies for the price of one. Because CIPS did not argue lack of consideration below, St. Paul had no opportunity (and even more important, no reason) to make a record on this issue. As a result, failure to apply the waiver doctrine to this case did not (as the majority state) reach a just result, but rather operates to prejudice St. Paul and weaken our system of appellate jurisdiction. See *Kravis v. Smith Marine, Inc.* (1975), 60 Ill. 2d 141, 148, 324 N.E.2d 417.

Based upon the above, I would affirm the judgment of the trial court.